IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| REX M. SUITER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-4048-CV-C-REL-SSA |
| | ) | |
| JO ANNE BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rex. M. Suiter seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ"): (1) erred in finding his mental impairment non-severe; (2) improperly discredited his credibility and, therefore, failed to properly determine his residual functional capacity; and (3) erred in relying on the Medical-Vocational Guidelines to establish there was other work he could perform. I find that the ALJ did not err in finding Plaintiff's depression non-severe, correctly determined that Plaintiff's allegations of disabling pain were not credible and based his residual functional capacity on that determination, and properly relied on the Medical-Vocational Guidelines. Therefore, Plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

Plaintiff submitted a claim for Supplemental Security Income benefits on February 26, 2003. On March 3, 2003, he applied for disability insurance benefits alleging that he had been disabled since November 11, 1998. Plaintiff's alleged disability stems from a back injury and depression. Plaintiff's application was initially denied. On May 26, 2004, a hearing was held before an Administrative Law Judge. On July 26, 2004, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On December 16, 2004, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which

2

is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988) (discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983) (discussing burden in disability insurance benefits case).

3

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.      Is the claimant performing substantial gainful activity?
          Yes = not disabled.
          No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

          No = not disabled.
          Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

          Yes = disabled.
          No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

          No = not disabled.
          Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

          Yes = disabled.
          No = not disabled.

### IV. THE RECORD

The record consists of the testimony of Plaintiff and his mother, Bessie Suiter, in addition to the documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

4

**Earnings Record**

Plaintiff's earning record indicates that he earned the following income from 1983 (age 19) through 1998:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1983 | $    29.33 | 1991 | $ 1,198.05 |
| 1984 | 2,513.53 | 1992 | 5,451.00 |
| 1985 | 8,117.47 | 1993 | 6,142.00 |
| 1986 | 3,367.75 | 1994 | 4,965.33 |
| 1987 | 7,162.75 | 1995 | 4,472.00 |
| 1988 | 6,365.00 | 1996 | 4,944.00 |
| 1989 | 2,797.00 | 1997 | 5,685.00 |
| 1990 | 4,473.56 | 1998 | 10,031.63 |

(Tr. at 70).

**Disability Report - Field Office**

On March 3, 2003, Joyce Brockhaus, Disability Report - Field Office Claims Representative, indicated that during a face-to-face meeting, Plaintiff had difficulty sitting and standing (Tr. at 72). Ms. Brockhaus observed that Plaintiff "had a back brace on, used a cane, shifted a lot, leaned toward his left when sitting, [and] stood up about 3 times in 90 minutes" (Tr. at 72). Plaintiff also "sighed a lot and appeared to be in significant pain the entire time"; Ms. Brockhaus noted that he "got up, sat down, and walked very slowly" (Tr. at 73).

**Disability Report -Adult**

In statements provided to the agency in support of his application for disability, Plaintiff reported taking Tylenol and Aleve to help relieve his pain (Tr. at 79). He also reported the following information concerning his employment history:

5

| Job Title | Dates Worked | Hours Per Day | Days Per Week | Rate of Pay |
|---|---|---|---|---|
| Cable Splicer | 04/10/94 - 12/25/95 | 10 | 5 | $10.00/hour |
| Carpenter | 1983 - 1990 | 10 | 5 | $ 5.50/hour |
| Carpet Cleaning/ Janitorial Services | 03/06/88 - 04/05/94 | 10 | 5 | $10.00/hour |
| Truck Driver - Rock Quarry | 1991 - 1992 | 8 | 5 | $10.00/hour |
| Water Well Driller & Laborer | 06/01/96 - 11/11/98 | 10 | 5 | $10.00/hour |

(Tr. at 75).

**Work History Report**

Plaintiff provided the following information detailing the jobs he has held in the last fifteen

years that he worked:

| Job Title | Dates Worked | Hours Per Day | Days Per Week | Rate of Pay |
|---|---|---|---|---|
| Water Well Driller & Laborer | 06/96 - 11/11/98 | 40-50 | 5-6 | $6.00/hour until the last six months, when he was making $10.00/hour |
| Phone Cable Splicer | 10/93 - 11-95 | 8 | 40 | $5.00/hour |
| Carpet Cleaner | 12/90 - 12/92 | never the same | 5-6 | $6.00/hour |
| Truck Driver | 03/90 - 11/90 | 8 | 40 | $10.00/hour |
| Carpet & Floor Cleaner | 12/89 - 02/90 | never the same | never the same | $6.00/hour |
| Carpenter | 04/83 - 11/88 | 8 | 5 | $5.00/hour |

(Tr. at 83-90). Some of the numbers Plaintiff listed were not directly responsive to the questions

asked. Specifically, it is not possible that Plaintiff could have worked forty to fifty hours a day as

6

a water will driller and laborer, or forty days per week as a cable splicer and truck driver. Based on a comparison to the work information he provided elsewhere in the record, however, it is apparent that Plaintiff instead worked forty to fifty hours per week as a water well driller and labor and forty hours per week as a cable splicer and truck driver.

### Claimant Questionnaire

Plaintiff stated he used to be an "outdoors" person and played tennis, ran, biked, hunted, fished, and water skied (Tr. at 93). Now, Plaintiff only leaves his house one to three times a month (Tr. at 93). He stated he was easy to get along with before his accident but now becomes angry more easily and is depressed (Tr. at 94). He wrote that he sometimes wanted "to take care of the pain with a bullet"(Tr. at 94).

### *B. SUMMARY OF MEDICAL RECORDS*

On November 19, 1998, an X-ray of Plaintiff's lumbar spine showed "a very significant spina bifida occulta[1] of S1 or a sacralized L5" with "very significant increased sacral angulation[2] almost at 90 degrees" (Tr. at 132). There also appeared to be a proximal dorsal sacral fracture (Tr. at 132).

A November 25, 1998, office note from Truman Lake Center indicated Plaintiff was "better" and that he had forgotten a previous appointment (Tr. at 151).

Janet R. Vale, M.D., of Columbia Occupational Medicine performed a Workers' Compensation evaluation for Plaintiff (Tr. at 123-131). Plaintiff was referred to Dr. Vale by his

---

[1]"Spina bifida" is an "embryologic failure of fusion of one or more vertebral arches." STEDMAN'S MEDICAL DICTIONARY 1649 (26th ed. 1995). "Spina bifida occulta" is "spinal bifida in which there is a spinal defect, but no protrusion of the cord or its membrane, although there is often some abnormality in their development." Id.

[2]"Angulation" is the "[f]ormation of an angle"; therefore, "sacral angulation" is "an abnormal angle or bend" of the sacrum. STEDMAN'S MEDICAL DICTIONARY at 90.

attorney (Tr. at 152). As part of the evaluation, Dr. Vale reviewed several years worth of medical records. She summarized Plaintiff's prior medical history as follows: In 1995, Plaintiff suffered a work-related injury to his ankle that required surgery (Tr. at 123, 127). He was felt to have a 5% permanent partial disability of the ankle (Tr. at 123). In 1990, Plaintiff sustained a hernia while lifting a large rock (Tr. at 123, 127). On November 19, 1998, Plaintiff was seen for low back pain (Tr. at 123). At that time, Plaintiff weighed 150 pounds (Tr. at 123). He was advised to use warm, moist packs and was placed on Naprosyn[3] and Ultram.[4]

Plaintiff returned on December 7, 1998, complaining of severe pain (Tr. at 123). Later that month he was referred to physical therapy and underwent therapy from December 18, 1998, until March 8, 1999 (Tr. at 123). Dr. Vale's review of Plaintiff's physical therapy records indicated he reported back pain, a stabbing sensation in his left hip, and limited weight bearing on his left leg (Tr. at 123). It was noted that Plaintiff had a leg length variance and used an insert (Tr. at 131).

Because of persistent symptoms, Plaintiff was referred to a neurosurgeon, Dr. Park (Tr. at 123). Dr. Park examined Plaintiff on January 11, 1999 (Tr. at 123, 151). Plaintiff indicated he had improved but still had pain in the left S1 region (Tr. at 123, 151). His exam was "entirely unremarkable" and he had an excellent range of motion (Tr. at 151). Plaintiff had no demonstratable neurological deficits (Tr. at 151). An X-ray did not show any abnormalities on Plaintiff's lumbar spine (Tr. at 123, 151). Plaintiff was given a heel lift to equilibrate the stress of the SI joint (Tr. at 123, 151). Dr. Park did not feel Plaintiff had a surgical condition (Tr. at 123).

---

[3]Naprosyn is a nonsteriodal anti-inflammatory that is used to reduce pain, inflammation, and stiffness. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00019a1 (last visited Oct. 14, 2005).

[4]Ultram is a pain reliever used to relieve moderate to moderately severe pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03826a1 (last visited Oct. 14, 2005).

Plaintiff saw Dr. Woodward, a physiatrist,[5] on January 29, 1999 (Tr. at 131, 151). In describing his accident, Plaintiff stated that he had fallen one to two feet of a drilling platform, hit a metal scaffold direction on his lower back, and sustained a "relatively large initial bruise which was there for several weeks" (Tr. at 131, 151). Imaging showed that his "left L5-S1 and left sacral contusion [was] improving" (Tr. at 131). Dr. Woodward commented that the "exact source of patient's pain [was] not clear" (Tr. at 131).

On February 12, 1999, Plaintiff's physical therapy records reflect that he was supposed to return to work but was unsure his employer would take him back due to concern of re-injury (Tr. at 131). He was very upset about possibly losing his job (Tr. at 131).

On February 15, 1999, Plaintiff saw Dr. Woodward again (Tr. at 131). Plaintiff was noted to be improving and Dr. Woodward felt he should be able to resume full activities in the near future (Tr. at 131).

Plaintiff's hip continued to feel as though it were out of place on February 19, 1999 (Tr. at 131).

On March 3, 1999, Plaintiff was referred to a work-conditioning program (Tr. at 131, 151).

Plaintiff returned to Dr. Woodward on March 8, 1999, and indicated he had recurrent pain after heavier bending and lifting at work conditioning (Tr. at 131). A CT scan was, therefore, taken on March 12, 1999, which revealed a bulging/herniated disc at the L4-5 level and a bulging disc at the L3-4 level on the left side; his SI joints were unremarkable (Tr. at 131). Plaintiff underwent a left SI joint injection on March 12, 1999 (Tr. at 131, 151). Plaintiff saw Dr. Woodward again on March

---

[5]"A physician specializing in physical medicine and rehabilitation. Physiatrists specialize in restoring optimal function to people with injuries to the muscles, bones, tissues, and nervous system." MedicineNet.com, Definition of Physiatrist, at http://www.medterms.com/script/main/art.asp?articlekey=4890 (last visited Oct. 15, 2005).

9

29, 1999, and reported no relief from the injection (Tr. at 131). Other than left-sided low back pain radiating into the mid-gluteal region, Plaintiff complained of no radicular[6] symptoms (Tr. at 131). He continued to feel incapable of heavy repetitive lifting (Tr. at 131).

Plaintiff was not felt to be a surgical candidate and on March 31, 1999, underwent a left L4-5 epidural steroid injection, with moderate improvement in pain as reported to Dr. Woodward on April 6, 1999 (Tr. at 131, 151). Dr. Woodward continued Plaintiff on modified duty for one week after which he was to resume regular duty (Tr. at 131). On April 16, 1999, Plaintiff was given a 5% permanent partial impairment of the total body and was released to full duty without restrictions (Tr. at 131, 152).

In addition to conducting a record review, Dr. Vale also performed a physical examination of Plaintiff on July 12, 1999, as part of Plaintiff's Workers' Compensation evaluation (Tr. at 125-130). Plaintiff reported that although he did not initially have symptoms of pain on his right side, his right leg now became numb with prolonged standing (Tr. at 126). After being released to work, Plaintiff attempted to increase his level of activity at home, but his pain increased and he realized he would be unable to perform his job (Tr. at 126).

Plaintiff reported continued "major left S1 joint" pain (Tr. at 126, 152). His attempts to do leg stretches at home helped temporarily (Tr. at 126). Plaintiff also reported increased pain going up and down stairs and when standing to do the dishes (Tr. at 126). At times he had to lie on the floor because of pain (Tr. at 126). Back pain made it difficult for Plaintiff to sleep (Tr. at 127). Plaintiff felt that, as of July 12, 1999, his symptoms were basically "staying the same" (Tr. at 126). He told Dr. Vale that it took him two days to mow two acres (Tr. at 126, 152). Sitting up in his truck

---

[6]Of, relating to, or involving a nerve root.

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 10 of 49

resulted in increased pain and it was much more comfortable if he kept his left leg straight (Tr. at 126). Plaintiff also stated that he had done some fishing since the accident and was only able to hunt one day that year (Tr. at 126, 152). He was not taking any medications (Tr. at 127).

At the time of the examination, Plaintiff weighed 181 pounds and indicated that his weight gain made him feel "awful" (Tr. at 128). Dr. Vale noted that Plaintiff wore a lumbosacral back support and walked with an "unusual gait," keeping his left leg straight (Tr. at 128, 152). Plaintiff experienced left-sided back pain when putting full weight-bearing pressure on his left leg (Tr. at 128). He also experienced discomfort when rising on his toes and heels (Tr. at 128). Plaintiff's left pelvic brim was found to be slightly higher than his right (Tr. at 128). Tenderness to palpation was present at the proximal sacrum and at the superior S1 joint distribution (Tr. at 128). Plaintiff reported pain at the end range of range of motion in all planes (Tr. at 128). There was guarding on palpation on Plaintiff's left gluteal distribution, though he did not have localized pain over his sciatic notch (Tr. at 128).

Dr. Vale found Plaintiff's left leg slightly longer than his right (Tr. at 129). Left and right straight leg raising was associated with pain (Tr. at 129). There was no specific muscle group weakness or wasting, although there was some generalized loss of muscle of the left leg, probably related to limited weight bearing as a result of his abnormal gait (Tr. at 129). Sensory examination revealed decreased sensation of the right lateral and, to a lesser extent, anterolateral thigh (Tr. at 129). Plaintiff was unable to place either ankle over the knee due to back pain (Tr. at 129).

According to Dr. Vale, review of X-rays previously taken of Plaintiff revealed a "mildly dorsally displaced proximal sacral fracture" (Tr. at 129). Review of a CT scan showed a "rather prominent disc bulge/herniation at the L4-5 level and [a] bulging disc to the left at L3-4" (Tr. at 129).

11

Dr. Vale's opinion, rendered to a reasonable degree of medical certainty, was that Plaintiff sustained a sacral fracture, as well as annular injury at the L4-5 and possibly L3- 4 disc levels, as a result of his November 11, 1998, fall at work (Tr. at 129). She recommended both follow-up radiographic studies to evaluate Plaintiff's sacrum,[7] as well as his entire pelvis and left hip, and MRI imaging of the lumbar spine to better evaluate his disc pathology (Tr. at 129-130). Until such evaluations were complete, Dr. Vale recommended the following work place restrictions: Plaintiff should have the opportunity to sit, stand or walk as needed to control back pain (Tr. at 130). He should avoid repetitive bending and twisting (Tr. at 130). He could lift up to twenty-five pounds occasionally, but no more than fifteen pounds frequently (Tr. at 130). Plaintiff should avoid climbing or working at unprotected heights (Tr. at 130). Finally, he should not drive any significant distances as a component of work and should avoid vibrational impact exposures to the spine and pelvis (Tr. at 130).

On September 16, 1999, Plaintiff underwent a CT scan of his sacrum and S1 joints; results were unremarkable (Tr. at 120). Radiologist Merlyn Gibson, M.D., later reviewed this film and found "[f]aint increased sclerosis to the midaspect of the sacrum. . . . This is fairly hazy and indistinct, and I suspect this could be some callus formation or bony response to either a fracture or stress fracture" (Tr. at 120-122). He also noted mild degenerative changes of the S1 joints on the right greater than the left (Tr. at 120-22). Based these results, Dr. Vale felt Plaintiff required further diagnostic imaging and/or treatment (Tr. at 120).

Plaintiff returned to see Dr. Vale on April 19, 2000, for a medical re-evaluation (Tr. at 117-

---

[7]The sacrum is "[t]he large heavy bone at the base of the pine, which is made up of fused sacral vertebrae. The sacrum is located int eh vertebral column, between the lumbar vertebrae and the coccyx. It is roughly triangular in shape and makes up the back wall of the pelvis." MedicineNet.com, Definition of Sacrum, at http://www.medterms.com/ script/main/art.asp?articlekey=7936 (last visited Oct. 15, 2005).

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 12 of 49

119). Plaintiff reported no significant improvement in symptomatology and function since he was last seen; in fact, he stated that his symptoms had increased in intensity (Tr. at 117, 152). He experienced numbness of the right buttocks radiating down his right leg and felt throbbing in his right calf (Tr. at 117). Plaintiff also reported pain in the popliteal fossa distribution[8] (Tr. at 117). He reported his right leg was numb all the time, particularly the bottom of his foot (Tr. at 117). He experienced weakness in his leg and indicated that he had recently fallen and bruised his right calf (Tr. at 117). Plaintiff reported he was again having left buttock and left hip pain, and that physical therapy had previously been beneficial in reducing the hip pain (Tr. at 117).

Additionally, standing for any length of time caused paresthesias[9] in Plaintiff's right leg (Tr. at 117). Plaintiff reported intermittent sleep disruption and associated this disruption with having no medications (Tr. at 117). He told Dr. Vale that no physicians would see him since he was involved in a Workers' Compensation claim (Tr. at 117). Plaintiff indicated that he spent his time lying on the floor, on the sofa, or in bed (Tr. at 117). After performing light activities, he reported needing to lie down (Tr. at 117). Plaintiff advised Dr. Vale he felt depressed and his weight gain due to inactivity made him feel worse (Tr. at 117). He was not taking any prescription medications (Tr. at 118).

Dr. Vale noted that Plaintiff appeared uncomfortable during the visit (Tr. at 118). He leaned back on the examining table to support his torso with his arms and supported his right leg with a stool (Tr. at 118). Dr. Vale observed that Plaintiff had a "rather unusual wide based gait" and did

---

[8]The popliteal fossa is "the diamond-shaped space [at the back of] the knee joint." STEDMAN'S MEDICAL DICTIONARY at 683.

[9]"Paresthesias" is "[a]n abnormal sensation, such as one of burning, pricking, tickling or tingling." STEDMAN'S MEDICAL DICTIONARY at 1300.

not heel strike on the right (Tr. at 118). Plaintiff also had limited weight bearing on the right side (Tr. at 118). There was a loss of normal lumbar lordosis[10] and marked tenderness at the lumbosacral level, throughout the sacrum and right S1 joint (Tr. at 118). His lumbar paraspinal and gluteal soft tissues were very rigid to palpation (Tr. at 118). While testing range of motion, Plaintiff experienced increased discomfort in his lumbosacral spine (Tr. at 118).

Dr. Vale noted ecchymosis[11] on the posterior to posterolateral portion of Plaintiff's right calf (Tr. at 118). Left straight leg raising was associated with low back pain at 75 degrees and on the right was associated with increased dysesthesia[12] (Tr. at 118). Motor strength testing revealed no specific muscle group weakness (Tr. at 118). A sensory exam revealed diffuse decreased sensation of the right foot as compared to the left in an L5 distribution (Tr. at 118). While seated, Plaintiff was able to raise his left leg to 90 degrees and he experienced paresthesias when his right leg was raised to 80 degrees (Tr. at 118).

Dr. Vale opined, at that time, no specific treatment of Plaintiff's sacral fracture would be beneficial and he should expected to continue to have some sacral pain (Tr. at 119). She again recommended Plaintiff undergo a lumbar MRI and gave him a prescription for Flexeril[13] for

---

[10]"Inward curvature of the spine. . . . The spine is not supposed to be absolutely straight, so some degree of curvature is normal. When the curve exceeds the usual range, it may be due to musculoskeletal disease or simple poor posture. Treatment is usually by physical therapy, although in severe cases surgery, casting, and/or bracing may be requried." MedicineNet.com, Definition of Lordosis, *at* http://www.medterms.com/script.main/art.asp?articlekey=4198 (last visited Oct. 15, 2005).

[11]"A purplish patch caused by extravasation of the blood into the skin." STEDMAN'S MEDICAL DICTIONARY at 539. To "extravasate" means to "exude from or pass out of a vessel into the tissues." Id. at 615.

[12]"A condition in which a disagreeable sensation is produced by ordinary stimuli; . . . [a]bnormal sensations experienced in the absence of stimulation." STEDMAN'S MEDICAL DICTIONARY at 531.

[13]Flexeril is a muscle relaxant used to relieve pain, tenderness, and limitation of motion caused by muscle spasms. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00963a1 (last visited Oct. 14, 2005).

nighttime use as needed, and Ultram for pain (Tr. at 119).

On September 12, 2000, Plaintiff underwent a lumbosacral MRI that showed (1) a central disk protrusion at L5-S1 that effaced the anterior thecal sac[14] and descending nerve roots and (2) degeneration of the L5-S1 disc (Tr. at 111, 113,115). Dr. Hillard noted that mild facet arthropathy[15] was seen at L4-5 and an increased signal was seen consistent with an annular tear[16] and high intensity zone[17] (Tr. at 110, 112, 114). In addition, Dr. Gibson opined there was some bilateral neural foraminal encroachment[18] at S-1 (Tr. at 115-116).

After reviewing the radiology findings from Plaintiff's September 12, 2000, MRI, Dr. Vale opined to a reasonable degree of medical certainty that Plaintiff's lumbar sacral disk changes at the L5-S1 level were directly and causally related to his November 11, 1998, fall (Tr. at 109). She strongly recommended that Plaintiff be seen by an orthopaedic spine specialist for an opinion as to

---

[14]A "fluid-filled sac surrounding the spinal cord." See Elliot Krames, Implantable Technologies: Spinal Cord Stimulation and Implantable Drug Delivery Systems, *available at* http://www.painconnection.org/MyTreatment/news implantabletherapy.asp (last visited Oct. 17, 2005).

[15]A "facet" is "[s] smooth area on a bone or other firm structure." STEDMAN'S MEDICAL DICTIONARY at 619. "Arthropathy" is defined as "any disease affecting a joint." Id. at 150.

[16]"The annulus is the fibrus ring of the disc structure which surrounds the centrally located soft nucleus of the disc. The nucleus and annulus function together to create a pressurized structure that acts as a shock absorber. The annulus is a ligament and like any ligament in the body can be torn. Tearing of the annulus can produce pain because the annulus has pain structures within its structure." Dr.Dillin.com, Definitions: Annular Tear, *at* http://www.drdillin.com/education/definitions_at.htm (last visited Oct. 17, 2005).

[17]A high intensity zone is an "[a]rea of high signal intensity on T2-weighted magnetic resonance images of the disc, usually referring to the outer annulus. . . . High intensity zones within the posterior annular substance may reflect fissure or tear of the annulus, but do not imply knowledge of etiology, concordance with symptoms, or need for treatment." American Journal of Neuroradiology, Nomenclature and Classification of Lumbar Disc Pathology - Glossary, *available at* http://www.asnr.org/spine_nomenclature/glossary.shtml (last visited Oct. 17, 2005).

[18]"Neural foramen" is defined as "the space through which nerve roots exit the spinal canal to form peripheral nerves and in which the nerve ganglia lie." Medocyclopaedia, Neural Foramen, *at* http://www.amershamhealth.com/medcyclopaedia/medical/querydb.asp?Query=neural+foramen&Title=on&Text=on &Caption=on&mode=All (last visited Oct. 15, 2005).

15

whether conservative versus surgical intervention was better (Tr. at 109, 152). Dr. Vale stated that, at best, Plaintiff would be able to perform sedentary to light demand category work as long as he had the opportunity to sit, stand, and walk as needed for pain relief (Tr. at 109, 152).

On April 3, 2001, Plaintiff saw Dr. Crabtree (Tr. at 152). Dr. Crabtree found "give-way" weakness in both of Plaintiff's legs, but felt that his gait and station were normal (Tr. at 152). Doctor's notes from this visit did not mention that Plaintiff used a cane (Tr. at 152). Dr. Crabtree reviewed both X-rays and reconstructed images of Plaintiff's sacrum from September of 1999, and felt they were normal (Tr. at 152). He also noted that Plaintiff's MRI showed no sacral abnormality (Tr. at 152). Although the September of 1999 MRI showed mild degenerative changes at multiple levels, Dr. Crabtree did not see evidence of root impingement (Tr. at 152-153). He did not feel Plaintiff had a surgically "removable" lesion present (Tr. at 153).

On August 14, 2001, Plaintiff was seen by Paul M. Olive, M.D., for a second independent medical evaluation upon referral by his attorney (Tr. at 133-35, 153). Plaintiff reported he experienced severe low back pain located over the lumbosacral junction across the sacrum that was exacerbated by bending, stooping, lifting, sitting, and any type of strenuous activity (Tr. at 133). He also reported numbness and occasional pain down his right leg (Tr. at 133). Plaintiff stated that treatment thus far had not been beneficial in reducing his pain (Tr. at 133). Plaintiff walked with a cane and told Dr. Olive his pain was incapacitating and that his quality of life had essentially been ruined by his injury (Tr. at 133).

Plaintiff was out of his medications, although he had previously taken Ultram, Flexeril, and an anti-inflammatory medicine that seemed to help (Tr. at 134). He had difficulty sitting, standing and moving about the examining room because of low back pain and numbness in his right lower

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 16 of 49

leg (Tr. at 134). Dr. Olive indicated that Plaintiff answered all questions in a seemingly truthful and complete manner (Tr. at 134).

Examination of Plaintiff's spine revealed tenderness to palpation over the midline of the lumbosacral junction (Tr. at 134). Range of motion of the lumbar spine was markedly limited due to low back pain (Tr. at 134). Sitting upright required Plaintiff to support his body with his hands on his knees and thighs (Tr. at 134). He experienced pain at a five degree extension (Tr. at 134).

The neurologic exam showed diffuse weakness in Plaintiff's right foot and ankle, Grade 4/5 strength in the plantar[19] and dorsiflexors[20] of the right foot, ankle, and leg (Tr. at 134). Plaintiff had decreased sensation to a pinprick in his right foot and leg (Tr. at 134). Straight leg raise on the right was negative; straight leg raise on the left was negative to 90 degrees (Tr. at 134).

After reviewing Plaintiff's MRI of September 12, 2000, and current X-rays that showed spina bifida occulta at L5-S1, Dr. Olive concluded Plaintiff's symptoms were secondary to discogenic[21] pain at L5-S1 with secondary radiculopathy[22] that was a direct result of his November 11, 1998, fall (Tr. at 134, 153). Dr. Olive indicated he would like Plaintiff to have a new MRI since the current scan was over one year old (Tr. at 134, 153). If a new MRI was consistent with the one reviewed,

_____

[19]"Plantar" means "[r]elating to the sole of the foot." STEDMAN'S MEDICAL DICTIONARY at 1375.

[20]A muscle causing flexion in a dorsal direction.

[21]"Denoting a disorder originating in or from an intervertebral disk." STEDMAN'S MEDICAL DICTIONARY at 491.

[22]Radiculopathy is "[a]ny disease of the spinal nerve roots and spinal nerves." MedicineNet.com, Definition of Radiculopathy, at http://www.medterms.com/script.main/art.asp?articlekey=14161 (last visited Oct. 15, 2005) Similarly, "lumbar radiculopathy" is "[n]erve irritation caused by damage to the discs between the vertebrae. Damage to the disc occurs because of degeneration ("wear and tear") of the outer ring of the disc, traumatic injury, or both." MedicineNet.com, Definition of Lumbar radiculopathy, at http://www.medterms.com/script.main/art.asp?articlekey=26093 (last visited Oct. 15, 2005).

17

Dr. Olive recommended a 360-degree fusion at L5-S1 with Harms cages[23] and bone grafting anteriorly, posterior instrumentation and nerve root compression (Tr. at 134).

Plaintiff underwent an AP and lateral X-ray of his lumbar spine (Tr. at 137). His L5 vertebrae appeared to be sacralized, with spina bifida occulta in the midline (Tr. at 137). The films were fairly normal, with very mild an anterior/superior osteophyte at L4 (Tr. at 137).

On December 14, 2001, Plaintiff was sent to David K. Ebelke, M.D., for yet another independent medical evaluation (Tr. at 151-156). Plaintiff had complaints of low back pain, with numbness and pain in the right buttock, anterior and posterior thigh, and posterior calf (Tr. at 151). He stated that his symptoms worsened with activity and reported feeling the same or worse than the first week or two after his injury (Tr. at 151). Plaintiff said his pain ranged from a four to an eight on a scale of zero to ten (Tr. at 151). Dr. Ebelke noted that Plaintiff's right leg symptoms did not develop until several months after being released by Dr. Woodward in mid-April of 1999 (Tr. at 151). Dr. Ebelke also noted that as part of his record review, he was provided a transcript of Plaintiff's January 30, 2001, deposition[24] (Tr. at 152). In his deposition, Plaintiff mentioned that he had been hunting several times since the injury and gone fishing (Tr. at 152).

Based upon Dr. Ebelke's review of Plaintiff's medical history and his examination, he concluded his gait looked forced and contrived (Tr. at 153). He noted that if weight bearing on the right caused him pain, then the correct way to use the cane would be on the left (Tr. at 153). Dr. Ebelke reported that Plaintiff was able to walk without the cane, but that his gait was exaggerated as if in severe pain with weight bearing on the right (Tr. at 153). Plaintiff could walk on his tiptoes

---

[23]Titanium mesh cages.

[24]A copy of Plaintiff's deposition is not included in the record.

18

and heals with difficulty, but his effort seemed exaggerated (Tr. at 153). Head compression caused low back pain, while a pelvic twist did not (Tr. at 153). Dr. Ebelke opined that "there [were] definite signs of symptom magnification present" (Tr. at 153).

Plaintiff's neurological exam was intact with full motor strength in his legs (Tr. at 153). His reflexes were symmetrical at his knees, ankles, and posterior tibialis at 3/5 (Tr. 153). After repeated testing, Dr. Ebelke never found any depression in the right ankle reflex or detected the motor weakness referenced by Dr. Olive but did, at times, observe decreased effort (Tr. at 153). Straight leg raising elicited complaints of back and hamstring pain, but Plaintiff's symptoms did not go below his knee and his overall root tension signs were negative (Tr. at 153). Dr. Ebelke's impression, without review of any of Plaintiff's prior scans or X-rays, was that Plaintiff suffered a lumbar strain/contusion rather than a sacral fracture (Tr. at 154). He stated that even if Plaintiff had sustained a sacral fracture, it would not result in long-term disability (Tr. at 154). He also discounted any opinions regarding possible SI joint disease as being related to his fall, stating that the type of minimal degenerative changes described in Plaintiff's SI joints could not be related to a work injury of that nature (Tr. at 154). Dr. Ebelke was unable to explain Plaintiff's complaints of pain and numbness in his right leg that developed after his initial injury, and described such complaints as "non-physiologic"[25] (Tr. at 154). He stated that Plaintiff's symptoms did not match any single dermatome,[26] which would be necessary if one were to link his right leg symptoms with foraminal stenosis (Tr. at 154).

_____

[25]Based on the context in which this term is used, I interpret non-physiologic complaints of pain as meaning pain for which there is no physiologic or organic cause.

[26]"A localized area of skin that has its sensation via a single nerve from a single nerve root of the spinal cord." MedicineNet.com, Definition of Dermatome, at http://www.medterms.com/script.main/art.asp?articlekey=2954 (last visited Oct. 15, 2005).

19

Dr. Ebelke recommended a lumbar myelogram and CT scan follow-up rather than having a new MRI taken (Tr. at 154). He also recommended a bone scan (Tr. at 154). Dr. Ebelke did not believe that a fusion would be beneficial or help Plaintiff return to work, and saw no reason why Plaintiff could not be employed currently in at least the medium work category, were he motivated to do so (Tr. at 155). He stated that the fact Plaintiff had remained completely off work since the injury suggested a poor work ethic (Tr. at 155). Dr. Ebelke felt a fusion had, at best, only a 50-60% chance of helping with some of Plaintiff's pain, but such surgery also had a high complication rate, and could possibly make his condition worse (Tr. at 155).

Dr. Ebelke's overall diagnosis of Plaintiff was degenerative lumbosacral disc, that was not caused by his work injury (Tr. at 155). Further medical care in his opinion was "optional" as he saw no reason why Plaintiff could not return to work in the medium category (Tr. at 156). If Plaintiff elected to live with his condition rather than undergoing surgery, then he would be at maximum medical improvement and Dr. Ebelke would put his disability rating at 7%, body as a whole, based on a small lumbar disc protrusion without neurological defect (Tr. at 156). Under these circumstances, Dr. Ebelke would recommend activity as tolerated, but could not restrict Plaintiff beyond a medium work category that permitted occasional lifting of fifty pounds and repetitive lifting of twenty-five pounds (Tr. at 156).

On February 12, 2003, Dr. Ebelke received Plaintiff's March 12, 1999, CT scan (Tr. at 137). He noted that there was a small central disc bulge or possible contained (subligamentous) protrusion, but that it did not appear to significantly affect the lateral recesses (Tr. at 137). Plaintiff's L5 was sacralized bilaterally (Tr. at 137). Plaintiff's SI joints looked fairly normal (Tr. at 137). Dr. Ebelke did not see anything that looked like a fracture in the S1, S2, or S3 areas (Tr. at 137). Although there

might have been a small amount of degenerative gas in the SI joints, he categorized such as an incidental finding that should not be considered post-traumatic, but instead as a long-term, minor degenerative change (Tr. at 137).

On February 19, 2002, Plaintiff underwent a lumbar myelogram[27] with CT scan follow-up at North Kansas City Hospital (Tr. at 143-49). Upon arrival at the hospital, he complained of low back pain, with symptoms going to his right buttock and thigh as well as his right calf (Tr. at 143). Plaintiff was sporadically taking Naproxen sodium, Ultram, and Cyclobenzaprine (Tr. at 143). A orthopedic examination revealed full motor strength in Plaintiff's legs (Tr. at 144).

Imaging did not reveal any abnormalities within Plaintiff's spine (Tr. at 150). The myelogram showed a sacralized L5 with spina bifida occulta (Tr. at 146). Small anterior epidural[28] defects were identified at L3-4 and L4-5 (Tr. at 146). Plaintiff's nerve sleeves filled well (Tr. at 146). Similarly, the CT scan showed (1) sacrilization of L5 and (2) generalized disk bulging at L4-5 with central focal protrusion that may impinge slightly on the left L5 nerve root (Tr. at 147-148). There was no additional evidence of HNP[29] (Tr. at 147-148).

Dr. Ebelke also read the lumbar myelogram as fairly normal (Tr. at 137). Plaintiff's L4-5 showed mild bilateral foraminal stenosis, but probably adequately open foramen (Tr. at 137). There was a central disc protrusion with spina bifida occulta at L5 and S1 and possibly distal as well (Tr.

---

[27]"An X-ray of the spinal cord and the bones of the spine. During a myelogram, a contrast material that is injected into the spinal cord is used to visualize the structures of the spinal cord and nerve roots." MedicineNet.com, Definition of Myelogram, *at* http://www.medterms.com/script.main/art.asp?articlekey=4482 (last visited Oct. 15, 2005).

[28]"Outside the dura, the outermost, toughest, and most fibrus of the three membranes covering the . . . spinal cord." MedicineNet.com, Definition of Epidural, *at* http://www.medterms.com/script.main/art.asp?articlekey=32517 (last visited Oct. 15, 2005).

[29]Herniated nucleus pulposus, or heniated disk.

at 137).  Based on the studies he reviewed Dr. Ebelke felt Plaintiff might benefit from a discectomy[30] and an one-level fusion of the L4-5 (Tr. at 137).

On February 21, 2002, Dr. Ebelke reviewed the bone scan of February 19, 2002, and found it to be a normal study of Plaintiff's spine (Tr. at 136).

On May 1, 2002, Dr. Ebelke received a lower pelvic/sacral CT scan dated September 16, 1999.  According to Dr. Ebelke, there was no evidence of a sacral fracture, although he did find minimal S1 degenerative joint changes (Tr. at 136).

On September 27, 2002, Dr. Ebelke received the lumbar MRI he had requested nine months earlier (Tr. at 136).  Dr. Ebelke felt the study could indicate an annular tear, but since the scan was done  twenty-two months after the original injury, the significance of a tear was unknown (Tr. at 136).  There was no herniation in the "usual sense of the term" (Tr. at 136).  Nerve root foramina were mildly decreased at L4-5 (Tr. at 136).  Dr. Ebelke opined that the bulging disc was not causing significant displacement or pressure on either of the S1 roots or on the central thecal sac.  Dr. Ebelke's prior opinions regarding causation were not changed by viewing the MRI (Tr. at 136).

In a March 30, 2002, letter to Bart E.  Eisfelder of Foland & Wickens, Dr. Ebelke reported his review of additional records did not change anything in his December 14, 2001, report regarding Plaintiff (Tr. at 142).   It was still his opinion that Plaintiff's work injury did not cause the degenerative disc at L4-5 (Tr. at 142).  Although he thought Plaintiff's injury may have caused a partial or contained central disc protrusion, he could not state so within a reasonable degree of medical certainty (Tr. at 142).  Dr. Ebelke noted he would have preferred to see Plaintiff's original MRI and found it hard to believe it had been lost or that it could not be reprinted (Tr. at 142).  Dr.

---

[30]"Excision, in part or whole, of an intervertebral disk."  STEDMAN'S MEDICAL DICTIONARY at 491.

Ebelke noted he was offering elective surgery to Plaintiff based upon a combination of long-term degenerative changes, chronic intractable pain that had not responded to conservative measures, and symptoms that were historically worsened by the work injury (Tr. at 142).

In an August 26, 2002, letter, Dr. Ebelke responded to an inquiry by the Honorable Judge Mark Siedlik, Division of Workers' Compensation (Tr. at 138-141). Dr. Ebelke stated he did not believe a repeat MRI would be helpful with respect to causation, treatment or diagnosis (Tr. at 138). He further commented on a copy of Dr. Olive's deposition transcript that had been forwarded to him for review.[31] Dr. Ebelke disagreed with twelve of Dr. Olive's conclusions regarding Plaintiff's condition. First, Dr. Ebelke stated that he tended to ignore high intensity zones ("HIZ") as being particularly meaningful or useful with respect to causation or treatment (Tr. at 138). He had seen a number of cases where HIZs were still present on a MRI several years after the initial scan; therefore, they did not necessarily mean an acute process was present (Tr. at 138). Dr. Ebelke noted that many others in the radiological community were also starting to ignore HIZs.

Second, it was not significant that Plaintiff fell almost flat on his back during the fall (Tr. at 138). Third, Dr. Ebelke disagreed that Plaintiff had diffuse weakness in his right foot and ankle (Tr. at 139). He stated that this was fairly non-physiologic, as even a bonafide disc herniation of the type Plaintiff sustained would not cause that kind of weakness (Tr. at 139). Dr. Ebelke further noted that his examination of Plaintiff's ankles revealed no weakness whatsoever (Tr. at 139). A small central bulge of the type described on the original MRI would not ordinarily affect the ankle reflex; it would take significant compression of the right S1 nerve root to cause the loss or decrease of a reflex and the initial scan reportedly did not show such compression (Tr. at 139).

---

[31] A transcript from Dr. Olive's deposition is not contained in the record.

Fourth, Dr. Ebelke stated that he could not agree within a reasonable degree of medical certainty that Plaintiff's lower back condition was caused by his November 11, 1998, injury (Tr. at 139). While the fall may have been a contributing cause, "whether it was substantial or not is . . . somewhat speculative" (Tr. at 139). Next, Dr. Ebelke disagreed with Dr. Olive's use of the term "degenerative" in describing Plaintiff's discs (Tr. at 139). He stated that Plaintiff's discs do not evidence "wear and tear" and still function as shock absorbers (Tr. at 139). Sixth, Dr. Ebelke noted that without viewing a prior scan, he could not tell whether Plaintiff's small central bulge was a work-related disc protrusion or whether it was acute (Tr. at 139).

Seventh, Dr. Ebelke advised that fusion for degenerative disc disease had mixed results and the results were not uniformly good (Tr. at 139). He also stated that a central disc protrusion did not mean instability or segmental instability as Dr. Olive implied (Tr. at 140). Regarding Dr. Olive's use of the term "give away weakness," Dr. Ebelke stated that this term generally referred to non-physiologic or apparent weakness, rather than to true weakness (Tr. at 140).

Tenth, Plaintiff's small central disc protrusion was not what is typically referred to as a "herniated disc" (Tr. at 140). In Dr. Ebelke's opinion, it did not impinge on the thecal sac due to its very small size (Tr. at 140). Eleventh, Dr. Ebelke pointed out that an annular tear could certainly be caused by aging in and of itself (Tr. at 140). He also noted that while smoking may not cause an annular tear by itself, it was well documented that smoking did lead to premature aging in the discs, and the aging process in the discs consisted of radial fissuring and microtears, which were basically what annular tearing was (Tr. at 140).[32]

---

[32] The record indicates that Plaintiff smoked anywhere from one pack every three to four days (Tr. at 118, 128), up to one-half to one pack everyday (Tr. at 128, 134, 143).

Dr. Ebelke summarized by stating that none of Plaintiff's studies showed evidence of a fracture (Tr. at 140). It was his opinion that the disc degeneration/dehydration was a long-term aging change and had nothing to do with the work injury (Tr. at 140). Plaintiff may have sustained a small central disc protrusion at L4-5 or L5-S1 in his work injury, but it would be speculation to suggest that it was caused by the work injury within a reasonable degree of medical certainty (Tr. at 140). He acknowledged that he and Dr. Olive were both fellowship trained spinal surgeons and it was not unusual for them to have differing opinions (Tr. at 141).

On April 15, 2003, at the request of the disability determination agency, Plaintiff saw Eddie W. Runde, M.D., an occupational physician, for a physiatric[33] exam (Tr. at 157-159). Dr. Runde noted that Plaintiff had not done anything on his own to help himself with his symptoms (including over-the-counter medications) (Tr. at 157). Plaintiff reported the ability to be on his feet for up to two hours if he took his pills and changed positions frequently (Tr. at 157). He could sit for up to one hour (Tr. at 157). Plaintiff stated he had right inguinal[34] area pain and, if he stood too long, he developed pain in the center of his back that felt like it was swelling to his right buttock and into his anterior right thigh (Tr. at 158). This pain extended through his calf into his foot (Tr. at 158). Plaintiff also reported increasing numbness in his right leg with prolonged standing (Tr. at 158). His entire right leg had decreased light-touch sensation from the hip distally, in a stocking distribution (Tr. at 158). Plaintiff's pain lessened if he took his medication and got off his feet (Tr. at 158). His current medications included Ultram, Cyclobenzaprine and Naproxen. According to Dr. Runde's

---

[33]Physiatrics refers to the practice of physical rehabilitation. STEDMAN'S MEDICAL DICTIONARY at 1362.

[34]"Relating to the groin." STEDMAN'S MEDICAL DICTIONARY at 872.

notes, Plaintiff liked to "ride his bicycle, work out, hunt/fish, play tennis and run in his free time." (Tr. at 158).

Using the short form McGill Pain Questionnaire, Dr. Runde found that there was an important affective component to Plaintiff's pain perception (Tr. at 158). The Oswestry Low Back Pain Disability Questionnaire indicated Plaintiff had a 58-60% perceived disability due to low back pain (Tr. at 158). Dr. Runde noted that this score was higher than expected from Plaintiff's observed behavior during the history and physical examination (Tr. at 158). The Beck Depression Inventory was consistent with severe depression (Tr. at 158). Dr. Runde noted that a low-level depression was common in people who have a chronic illness, including chronic pain syndromes (Tr. at 158).

Dr. Runde's notes indicate Plaintiff was able to dress/undress and get onto/off of the examination table without assistance (Tr. at 158). His Waddell's non-physiological signs were clinically significant in that all were positive except for distraction straight leg raising (Tr. at 158). Plaintiff had tenderness with light touch in the lumbar spine and regional tenderness in the lumbar area (Tr. at 158). Patrick's tests were notable for increased symptoms and his symptoms were also reproduced with hip flexion (Tr. at 158). Plaintiff had pain on straight leg raising both when lying on his back and when and seated (Tr. at 159). He also had low back pain with dorsiflexion and plantar flexion of his right ankle (Tr. at 159). His total sacral range of motion was 30 degrees, lumbar spine was 64 degrees flexion and 14 degrees lateral flexion to the right and 24 degrees to the left, suggesting his range of motion was valid (Tr. at 159). Plaintiff's Waddell's non-physiologic signs on his lumbar spine examination were negative (Tr. at 159).

Strength testing of Plaintiff's legs were affected by complaints of pain (Tr. at 159). His gait was notable for minimal weight bearing on the right leg (Tr. at 159). Deep tendon reflexes were 2/4

and symmetric at the Achilles and patellar tendons (Tr. at 159).  Plaintiff had no clonus[35] and his Babinski response was absent bilaterally (Tr. at 159).

Plaintiff's diagnoses included: (1)  low back pain syndrome; (2) spina bifida occulta (based on record review); (3) degenerative spine disease; (4) sacroiliitis[36] (based on record review); and (5) and coccydynia[37] (based on record review) (Tr. at 159).  Dr. Runde determined Plaintiff should be able to stand and walk up to six hours in a workday with normal breaks (Tr. at 159).  In addition, he should limit sitting to no more than one hour at a time for a total of four hours in an eight-hour workday with normal breaks (Tr. at 159).  Given these restrictions, Plaintiff was thought capable of working a forty-hour workweek on a continuous basis (Tr. at 159).

Plaintiff was seen on June 25, 2003, at the Truman Lake Clinic (Tr. at 176).  He was out of medications (Tr. at 176).  Plaintiff stated he had seen numerous specialists and needed surgery; the whole situation had him very depressed (Tr. at 176).  Clinic notes reflect Plaintiff used a cane and that his gait was slow and halting (Tr. at 176).  Plaintiff was scheduled to be seen again in two weeks for a complete neurological exam (Tr. at 176).

Plaintiff filed an application for public assistance and on September 24, 2003, was seen by Jacqueline Pepper, a licensed clinical social worker, and by Dr. Margaret L.  Harlan, a licensed psychologist, in order to determine his eligibility for both Medicaid and General Relief (Tr. at 187-191).  He arrived to the appointment wearing a back brace and using a cane (Tr. at 187).  Plaintiff

---

[35]"A form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession." MyMedAdvice, Medical Glossary, at http://www.mymedadvice.com (last visited Oct. 19, 2005).

[36]"Inflamation of the sacroiliac joint."  STEDMAN'S MEDICAL DICTIONARY at 1565.

[38]"Pain in the coccyx (the tailbone)." MedicineNet.com, Definition of Coccydynia, at http://www.medterms.com/script.main/art.asp?articlekey=11431 (last visited Oct. 15, 2005).

needed to lie down on the couch in the examiner's room halfway through the interview due to pain (Tr. at 187). He was taking Naproxen, Cyclobenzaprine and Ultram for back pain, and had been taking Effexor[38] for depression for a couple of years (Tr. at 188).

Plaintiff reported he first became depressed when he thought he was going to have corrective surgery for his back then learned the insurance company would not pay for it (Tr. at 188-189). He also experienced depression due to not being able to do the things he used to do as well and not being able to help other people (Tr. at 189). He felt he was a burden to his mother and this guilt added to his depression (Tr. at 189). Plaintiff indicated he had been diagnosed with depression and put on medication by his primary care physician (Tr. at 188-189). Medication helped alleviate his symptoms of depression (Tr. at 189).

Plaintiff stated that he enjoyed biking, hunting and fishing but was unable to do any of these activities for an extended period of time (Tr. at 189). He used to be very sports oriented but now could barely stand so rarely left his home (Tr. at 189). He does little driving because was is painful for him to sit up straight without pain; he needed to keep his right leg extended to avoid severe pain (Tr. at 189). Plaintiff stated he could only stand or walk for short periods of time due to pain and throbbing in his back (Tr. at 189). He reported his right foot is always numb, but gets worse when he stands or walks (Tr. at 189). He was able to dress and bathe himself, but even those tasks were difficult (Tr. at 190).

Plaintiff was oriented to time, place and person, had good memory, understood and followed directions well, could write a proper sentence, and was able to copy a design (Tr. at 190). He knew

---

[38]Effexor is an antidepressant used to relieve symptoms of depression, generalized anxiety disorder, and social anxiety disorder. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03181a1 (last visited Oct. 14, 2005).

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 28 of 49

the current and previous presidents of the United States, understood one of two proverbs read to him, could count down from twenty by ones, and could count by threes (Tr. at 190). He declined to count down from one hundred by sevens or from twenty by threes, saying, "No, I can't" (Tr. at 190). He was able to recall twelve items from a twenty-five item paragraph read to him (Tr. at 190). Although he commented that his pain medication affected how fast he could process information and respond, he seemed to do well on most test items (Tr. at 190).

Plaintiff was diagnosed with recurrent major depression, due to medical issues (Tr. at 190). Ms. Pepper and Dr. Harlan found Plaintiff's self-report to be credible and, therefore, thought his assessment was valid (Tr. at 191). As a result, they completed a Medicaid Assistance/General Relief Certification form on September 24, 2003, indicating Plaintiff, due to some physical or mental impairment, was substantially precluded from engaging in any occupation within his competence for one year or longer, and was eligible for both Medical Assistance and General Relief (Tr. at 186).

Also as a part of his application process, Plaintiff saw Ronald Pak, M.D., on October 10, 2003 (Tr. at 184-85). His current medications included Naproxen, Flexeril, Ultram, and Effexor (Tr. at 184). Plaintiff stated he wanted to have surgery and wanted to be "fixed" (Tr. at 184). Plaintiff reported doing minimal household chores (Tr. at 184). He reported constant back and right leg pain; his whole right leg was numb (Tr. at 184). Plaintiff used a cane and wore a back brace (Tr. at 184). He walked with an unusual gait, where he limped on the right but kept all of his weight on his right toes (Tr. at 184). Putting weight on his heel was painful (Tr. at 184). Plaintiff kept his right leg bowed and in an externally-rotated position (Tr. at 184). His sitting and lying straight leg raise were negative (Tr. at 184). Plaintiff gave limited effort with right lower extremity muscle testing of the hip, knee, and ankle (Tr. at 184). He had full leg strength (Tr. at 184). There was patchy numbness

"right leg over thigh and calf" (Tr. at 184). Plaintiff reported a high degree of pain at 90 degrees hip flexion during the knee-to-chest stretch

Dr. Pak's impression was that Plaintiff suffered from chronic right back and leg pain since his fall in 1998 (Tr. at 185). He felt that Plaintiff could have symptoms related to disc abnormality, but felt his current presentation was "extreme and out of proportion to this finding. He might benefit from further treatment including psychological counseling, however, I am concerned that surgical treatment may not 'fix him' back to normal" (Tr. at 185). Dr. Pak agreed to approve Plaintiff's Medicaid application because "updated spinal imaging would probably be helpful" (Tr. at 185). Because he did not accept his current situation, Dr. Pak did not see Plaintiff successfully returning to work at that time (Tr. at 183, 185).

On November 7, 2003, Plaintiff returned to the Truman Lake Clinic for follow-up with Theodore J. Beltz, D.O. (Tr. at 175). Plaintiff was started on Effexor 75 mg, once a day (Tr. at 175). An MRI was ordered and Dr. Beltz planned to refer him to an orthopaedic surgeon (Tr. at 175).

Plaintiff under went a MRI of his lumbar spine on December 1, 2003 (Tr. at 180-181). He had a mild central disc bulge at L5-S1 without central canal stenosis or focal nerve root impingement; otherwise the MRI of his lumbar spine was normal (Tr. at180-181). On December 9, 2003, Plaintiff saw Dr. Beltz to discuss the results of his MRI (Tr. at 174). It appeared his disc protrusion had improved on its own (Tr. at 174). Although previous MRIs indicated that the bulge was compressing the thecal sac, it had regressed and there was no impingement on the central canal at all (Tr. at 174). Plaintiff admitted his pain was improving (Tr. at 174).

On January 14, 2004, Plaintiff again reported that his back pain has slowly improved (Tr. at 173). He still felt like he was unable to work, stating his back was very sensitive and he felt like he

may injure it again at any time (Tr. at 172). Office notes from March 3, 2004, indicated Plaintiff wanted to discuss back surgery and would "try to consult chiropractor to rule out 'short leg'" (Tr. at 170).

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On May 13, 2003, Dr. Stoecker performed a physical residual functional capacity assessment and made the following findings: Plaintiff could lift or carry up to fifty pounds occasionally and up to twenty-five pounds frequently; he could stand or walk with normal breaks for a total of about six hours in an eight-hour workday; he could sit with normal breaks for a total of about six hours in an eight-hour workday; and his ability to push and pull was unlimited (Tr. at 161). Dr. Stoecker's conclusions were based on Plaintiff's decreased exertion due to complaints of back pain with non-physiologic responses to testing that severely impaired his credibility (Tr. at 161). Furthermore, Dr. Stoecker also noted that

> [t]here have not been serial examinations documenting any radiculopathy. Initially it was questioned whether he could have had a sacral fracture but review of the X-ray/MRI shows that the finding is not consistent with a fracture since the haziness/artifact is central. . . . There is no evidence that Mr. Suiter needs surgery for his condition or that surgery would relieve his complaints of symptoms. He has had in addition three examinations by specialists which call into question his credibility.

(Tr. at 161-62).

In addition, Dr. Stoecker found Plaintiff to be able to frequently balance, kneel, and crawl (Tr. at 163). He could occasionally climb, stoop, and crouch (Tr. at 163). Plaintiff did not have any manipulative, visual, or communicative limitations (Tr. at 164-65). Dr. Stoecker did conclude,

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 31 of 49

however, that Plaintiff should avoid concentrated exposure to constant high-velocity vibration (Tr. at 165). Finally, Dr. Stoecker opined that, based on Plaintiff's impairment, the severity or duration of his symptoms were disproportionate to the expected severity or expected duration. He noted, "There is no established diagnosis . . . which would account for the pain he [Plaintiff] describes. He has given poor effort and non-physiologic responses to multiple orthopedic and physiatric exams that severely impair his credibility" (Tr. at 166).

### D. SUMMARY OF TESTIMONY

During the hearing, Plaintiff and his mother, Bessie Suiter, both testified.

**1.      Plaintiff's testimony.**

Plaintiff was born June 3, 1964, and lives in Warsaw, Missouri, with his mother (Tr. at 37, 54). He stated he was 5'8" tall and weighed 206 pounds (Tr. at 37). Plaintiff considered 150 pounds to be his normal weight and attributed his weight gain to low back and right leg pain, which prevented him from exercising (Tr. at 37).

Plaintiff has a twelfth-grade education (Tr. at 37). For the past three years, Plaintiff worked drilling wells (Tr. at 38). While doing so, he was responsible for filling the water truck with water, greasing and checking the fluids in the drill rig, setting up the rig, and ultimately drilling the well (Tr. at 38). Plaintiff was required to lift hand tools, walk planks, drill stands, and bits (Tr. at 38). He estimated that the heaviest weight he had to lift was 400 pounds (Tr. at 38). This job also required Plaintiff to be on his feet and to do some climbing (Tr. at 38).

Prior to drilling wells, Plaintiff worked for two years at B&D Cable Splicing (Tr. at 38-39).

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 32 of 49

There, he was required to climb telephone poles, hang boots[39] off of a ladder, and lift up to seventy-five pounds in weight (Tr. at 39). Plaintiff also was employed cleaning carpets and doing janitorial work, building homes, and working as a rock quarry driver (Tr. at 39-40). As a janitor and carpet cleaner, Plaintiff was on his feet, lifted equipment, and moved furniture in residential homes (Tr. at 40). He estimated that this job required him to lift a maximum of 100 pounds (Tr. at 40). Plaintiff also lifted weights up to 400 pounds while working in construction (Tr. at 40).

On his last job, Plaintiff suffered a hip fracture and a herniated disk (Tr. at 41). He underwent physical therapy, electrolysis, and epidurals to treat his back condition (Tr. at 41). Some of his doctors recommended surgery while others did not (Tr. at 41-42). Although Plaintiff filed a Workers' Compensation claim for his injuries, there was a dispute as to whether his injuries were work-related (Tr. at 42 -43).

When asked to provide a history of his medical treatment, Plaintiff stated as follows: An X-ray was obtained immediately following his accident and Plaintiff was sent to therapy (Tr. at 42). Because he was not showing signs of improvement, he went to a doctor in Springfield (Tr. at 42). After being given two epidurals, Plaintiff was able to return to work (Tr. at 42). His pain worsened, however, and he next was seen by Dr. Crabtree, Dr. Olive, Dr. Ebelke, and Dr. Vale (Tr. at 42-43). Upon being approved for Medicaid, Plaintiff's family doctor referred him to a neurosurgeon in Columbia, but the earliest appointment he could get was in August of 2004 (Tr. at 44).

Plaintiff testified he suffered from low back pain, which radiated down his right leg through his foot (Tr. at 44). The pain was constant and varied in intensity between a four and four and a half

---

[39]Plaintiff described the process of "hanging boots" as placing a plastic covering over the spliced cable to keep out moisture. Performing this task required him to remain in a squatting or bending position (Tr. at 39).

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 33 of 49

to a ten on a pain scale of zero to ten (Tr. at 44-45). He experienced pain at a level of ten several times a week (Tr. at 45). Standing, walking and sitting all aggravated his pain (Tr. at 45). His pain is better if he stays off his feet and takes his medications (Tr. at 45). Plaintiff also has difficulty walking more than a block or a block and a half because of pain, numbness and weakness in his right leg (Tr. at 45). For the same reasons, Plaintiff can only stand twenty to thirty minutes, at most (Tr. at 45). He can not sit for longer than forty-five minutes (Tr. at 46). Plaintiff testified that he could lift no more than ten pounds (Tr. at 46). Finally, he stated he needs to lie down to relieve his back pain and estimated that he spend six to seven hours a day lying down (Tr. at 46).

On a typical day, Plaintiff wakes up at 5:30 a.m., when his mother leaves for work (Tr. at 46-47). He then lies on the sofa, except to go the bathroom or to take care of the dishes (Tr. at 47). Plaintiff tries to keep his mother's small lawn mowed, mowing approximately once every three weeks, but has to take pain pills to do so (Tr. at 47). He stated that mowing the lawn typically took about twenty minutes, and that he would be in "major pain" and need to lie down afterward (Tr. at 47).

Plaintiff testified he was depressed and that he cries a lot wondering why this happened to him; he felt bad that his mother had to take care of him (Tr. at 48). His medication caused him to have difficulty concentrating and he stated that he was unable to focus and follow one-hour programs on television (Tr. at 48). Plaintiff testified he did not read because, "due to the medications[,] I can't focus or I lose my place, I can't really even remember what I've read, if I've read it" (Tr. at 51). Plaintiff used to enjoy archery, hunting and fishing, as well as water skiing, playing tennis, riding a motorcycle and photography (Tr. at 49). He is no longer able to participate in any of these hobbies, however, due to his back pain (Tr. at 49). Furthermore, Plaintiff testified he did not attend meetings

34

or church and drove very little (Tr. at 49). The longest distance he had recently driven was thirty miles, and doing so caused him pain (Tr. at 49-50)

Plaintiff had been using a cane to walk since about a year after his accident (Tr. at 50). He testified that, for the first year to year and a half after his accident, he was not on his feet except to attend physical therapy (Tr. at 50). When he was on his feet for more than a short period of time, the numbness in his right leg was so severe that he could no longer stand (Tr. at 50). At that point, Plaintiff realized his problem was more than a fractured hip (Tr. at 50). Now anytime he is on his feet he uses a cane (Tr. at 50). Plaintiff testified that if he stays off his feet, pain medications make his pain tolerable (Tr. at 51). After taking the medication, his pain was at a level four on the pain scale (Tr. at 51).

Other than washing the dishes, Plaintiff does not perform any housework (Tr. at 51-52). His mother does all the cooking and grocery shopping (Tr. at 52). Plaintiff does not participate in activities outside his home (Tr. at 52). If he has to go to the doctor, either his sister or mother takes him (Tr. at 52).

### 2. Bessie Suiter's testimony.

Plaintiff's mother, Bessie Suiter, appeared at the hearing and offered testimony on behalf of her son (Tr. at 52-54). According to Ms. Suiter, the changes in her son before and after his injury were "like day and night" (Tr. at 52). She stated that before his injury, Plaintiff worked all the time (Tr. at 53). When he was not working, he was participating in sports, archery in particular (Tr. at 53). Ms. Suiter testified that her son complained frequently about back pain and numbness in his right leg (Tr. at 53). Plaintiff spent most of his day sleeping and appeared depressed (Tr. at 53). He would not eat, could not sleep, and refused to talk with friends (Tr. at 54). At times, Plaintiff was

35

so depressed that Ms. Suiter was afraid he would not be alive when she returned from work (Tr. at 53).

## E. FINDINGS OF THE ALJ

On July 26, 2004, the ALJ issued an opinion finding Plaintiff "not disabled" at step five of the sequential analysis. The ALJ found at step one that Plaintiff has not worked since his alleged onset of disability (Tr. at 26). At step two, the ALJ found Plaintiff's degenerative disc disease and central disc bulge at L5-S1 severe, but that his mental impairment was not severe (Tr. at 26). At step three of the analysis, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment (Tr. at 26).

The ALJ next found Plaintiff's allegations regarding his limitations were "not totally credible" (Tr. at 26). Based on Plaintiff's medical records and the evidence adduced at the hearing, the ALJ found Plaintiff had "the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours in an 8-hour day; and sit 6 hours in an 8-hour day. Pushing and/or pulling is unlimited other than as shown for lifting and/or carrying" (Tr. at 26). With that residual functional capacity, Plaintiff was found to be unable to perform past relevant work (Tr. at 26).

Finally, the ALJ found that Plaintiff was a "younger individual between the ages of 18 and 44," and that he had a "high school (or high school equivalent) education" (Tr. at 26). He also found that Plaintiff could perform the full range of light work (Tr. at 26). Based on Plaintiff's age, education, work experience, and exertional capacity for light work, the ALJ determined that he was "not disabled" according to Medical-Vocational Rule 202.21 (Tr. at 26).

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 36 of 49

## V. SEVERITY OF DEPRESSION

Plaintiff alleges that the ALJ erred in finding his mental impairment non-severe. In order to proceed past step two in the sequential disability evaluation, as outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c), a claimant must have a severe impairment. The regulations define a "severe impairment" as "an impairment or combination of impairments which significantly limits [the claimant's] physical and mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (regarding disability insurance benefits); 20 C.F.R. § 416.920(c) (regarding supplemental security income benefits). If, however, an impairment is controllable by medication or amenable to treatment, it is not considered disabling. Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000) (quoting Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)); Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

Here, Plaintiff was diagnosed with depression (Tr. at 183, 186, 190). However, he was prescribed Effexor and conceded that it was effective in alleviating his symptoms (Tr. at 189). The record does not contain evidence to the contrary.[40] Although it is not entirely clear when Plaintiff first began taking Effexor,[41] his medical records do not indicate that his prescription was ever modified, either in amount or by changing drugs altogether, or otherwise suggest that Effexor was not successful in controlling his depression.

---

[40] Plaintiff's statement that he sometimes wanted "to take care of the pain with a bullet" was recorded in his March 25, 2003, Claimant Questionnaire (Tr. at 94), six months before he told Dr. Harlan and Ms. Pepper that Effexor controlled his depression and, apparently, before he began taking Effexor, see infra footnote 41.

[41] Dr. Harlan and Ms. Pepper's September 24, 2003, report states that Plaintiff had been diagnosed with depression by his primary care physician, Dr. Belts, and had been taking Effexor for a couple of years (Tr. at 188-189). During Plaintiff's October 10, 2003, appointment with Dr. Pak, he also reported taking Effexor (Tr. at 184). However, Dr. Belt's office notes indicate that Plaintiff was not started on Effexor until November 7, 2003 (Tr. at 175). In fact, Dr. Belt's office note from Plaintiff's June 25, 2003, visit contains a list of Plaintiff's current medications; Effexor was not amongst those included.

Moreover, Plaintiff's controlled depression did not prevent him from being able to perform basic work activities. Testing by Dr. Harlan and Ms. Pepper revealed that Plaintiff was

> oriented to time, place, and person, has a good memory, understands and follows
> directions well, can write a proper sentence and copy a design. He knew the current
> and previous president of the U.S. He understood one of the two proverbs read to
> him. He was also able to count down from 20 by 1's and count by 3's. He declined
> to count town from 100 by 7's or from 20 by 3's , saying, "No, I can't." He was able
> to recall twelve items from a twenty-five element paragraph read to him.

(Tr. at 190). Despite commenting that his pain medication affected his ability to process information and respond quickly, Plaintiff did well on most of the test items (Tr. at 190). Importantly, Dr. Harlan and Ms. Pepper attributed Plaintiff's inability "to work or function well" not to Plaintiff's mental condition, but instead to his "very poor physical health due to back pain" (Tr. at 191) (emphasis added). As a result, the ALJ's finding that Plaintiff's depression was not a medically severe impairment is supported by substantial evidence.

### VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ failed to consider how his depression affected his perceptions of pain and, therefore, improperly discredited his allegations of pain.

#### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

38

The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including Plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as Plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 at 1322.

The specific reasons for discrediting Plaintiff's subjective complaints of disability are as follows:

### 1. PRIOR WORK RECORD

Plaintiff's Earning Record and the information he provided in his Disability Report and Work History Report indicates that he worked sporadically and earned very little over his lifetime. According to the figures contained in his Earnings Record, Plaintiff's highest annual earnings occurred in 1998 when he made $10,031.63; his average annual earnings for the sixteen years he worked is $4,857.21.

These figures stand in marked contrast the earnings reported in his Disability Report and

Case 2:05-cv-04048-REL   Document 13   Filed 10/26/05   Page 39 of 49

Work History Report.  Comparison of the figures contained in the respective reports reveal

discrepancies between the dates during which Plaintiff worked at his respective jobs, Plaintiff's rate

of pay per hour and yearly income,[42] as well as between the hours per day and days per week he

worked.[43]  In some years, Plaintiff indicated that he worked multiple jobs for ten hours per day, five

---

[42]Plaintiff's annual earnings, to the extent he provided the hours per day and hours per week that he worked in his Disability Report (Tr. at 75) and Work History Report (Tr. at 83-90), compare to his annual income as reported in his Earnings Record as follows:

| Year | Earnings Record | Disability Report | Work History Report | Year | Earnings Record | Disability Report | Work History Report |
|------|------|------|------|------|------|------|------|
| 1983 | $    29.33 | $14,300.00 | $ 7,600.00 | 1991 | $1,198.05 | $46,800.00 | $ |
| 1984 | 2,513.52 | 14,300.00 | 10,400.00 | 1992 | 5,451.00 | 46,800.00 | |
| 1985 | 8,117.47 | 14,300.00 | 10,400.00 | 1993 | 6,142.00 | 26,000.00 | 2,600.00 |
| 1986 | 3,367.75 | 14,300.00 | 10,400.00 | 1994 | 4,965.33 | 26,500.00 | 10,400.00 |
| 1987 | 7,162.75 | 14,300.00 | 10,400.00 | 1995 | 4,472.00 | 25,500.00 | 8,600.00 |
| 1988 | 6,365.00 | 35,300.00 | 9,600.00 | 1996 | 4,977.00 | 15,000.00 | 8,370.00 |
| 1989 | 2,797.00 | 40,300.00 | | 1997 | 5,685.00 | 26,000.00 | 14,040.00 |
| 1990 | 4,473.56 | 40,300.00 | | 1998 | 10,031.63 | 22,500.00 | 16,020.00 |

In his Work History Report, Plaintiff indicated that he worked forty to fifty hours a week as a water well driller; therefore, his annual pay was calculated based on a forty-five hour work week.  Income for years in which Plaintiff worked as a carpet cleaner/janitor were not calculated, as he stated that the hours per day and days per week he worked were "never the same."

[43] The Disability Report contained the following information:

| Years | Job Title | Hours/Day | Days/Week | Pay/Hour |
|------|------|------|------|------|
| 1983 | Carpenter | 10 | 5 | $ 5.50 |
| 1984 | Carpenter | 10 | 5 | 5.50 |
| 1985 | Carpenter | 10 | 5 | 5.50 |
| 1986 | Carpenter | 10 | 5 | 5.50 |
| 1987 | Carpenter | 10 | 5 | 5.50 |
| 1988 | Carpenter | 10 | 5 | 5.50 |
| | Carpet Cleaning/Janitorial (beginning on 03/06/88) | 10 | 5 | 10.00 |
| 1989 | Carpenter | 10 | 5 | 5.50 |
| | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |
| 1990 | Carpenter | 10 | 5 | 5.50 |
| | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |
| 1991 | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |
| | Truck Driver | 8 | 5 | 10.00 |
| 1992 | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |
| | Truck Driver | 8 | 5 | 10.00 |
| 1993 | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |
| 1994 | Cable Splicer (beginning 04/10/94) | 10 | 5 | 10.00 |
| | Carpet Cleaning/Janitorial | 10 | 5 | 10.00 |

40

days per week, which would be physically impossible.  This factor, therefore, supports the ALJ's credibility determination.

## 2.  DAILY ACTIVITIES

Comparison of statements Plaintiff made to his various medical providers are not consistent the description of his symptoms given at his administrative hearing.  Specifically, Plaintiff told Dr. Vale that it took him two days to mow two acres (Tr. at 126), although he testified that he could mow the lawn in approximately twenty minutes (Tr. at 47).  He also provided different assessments

|  |  | (through 04/05/94) |  |  |  |
|---|---|---|---|---|---|
| 1995 | Cable Splicer (through 12/25/95) | 10 | 5 | 10.00 |
| 1996 | Water Well Driller (beginning 06/01/96) | 10 | 5 | 10.00 |
| 1997 | Water Well Driller | 10 | 5 | 10.00 |
| 1998 | Water Well Driller (through 11/11/98) | 10 | 5 | 10.00 |

(Tr. at 75).  The information listed in the Work History Report included:

| Years | Job Title | Hours/Day | Days/Week | Pay Rate |
|---|---|---|---|---|
| 1983 | Carpenter (beginning 04/83) | 8 | 5 | $ 5.00 |
| 1984 | Carpenter | 8 | 5 | 5.00 |
| 1985 | Carpenter | 8 | 5 | 5.00 |
| 1986 | Carpenter | 8 | 5 | 5.00 |
| 1987 | Carpenter | 8 | 5 | 5.00 |
| 1988 | Carpenter (through 11/88) | 8 | 5 | 5.00 |
| 1989 | Carpet Cleaning/Janitorial (beginning 12/89) | never same | never same | 6.00 |
| 1990 | Carpet Cleaner/Janitorial (through 02/90) | never same | never same | 6.00 |
|  | Carpet Cleaning/Janitorial (beginning 12/90) | never same | never same | 6.00 |
|  | Truck Driver (03/90-11/90) | 8 | 40 | 10.00 |
| 1991 | Carpet Cleaning/Janitorial | never same | 5-6 | 6.00 |
| 1992 | Carpet Cleaning/Janitorial (through 12/92) | never same | 5-6 | 6.00 |
| 1993 | Cable Splicer (beginning 10/93) | 8 | 40 | 5.00 |
| 1994 | Cable Splicer | 8 | 40 | 5.00 |
| 1995 | Cable Splicer (through 11/95) | 8 | 40 | 5.00 |
| 1996 | Water Well Driller (beginning 06/96) | 40-50 | 5-6 | 6.00 |
| 1997 | Water Well Driller | 40-50 | 5-6 | 6.00 |
| 1998 | Water Well Driller (through 11/11/98) | 40-50 | 5-6 | 6.00/10.00 |

(Tr. at 83-89).  Plaintiff stated that as a water will driller, he made $6.00/hour until the last six months at which time he earned $10.00/hour (Tr. at 90).

41

of the period of time for which he could stand, sit and walk. On April 15, 2003, Plaintiff told Dr. Runde he was able to be on his feet for up to two hours if he took his medication and changed positions frequently and that he could sit for one hour (Tr. at 157). By contrast, he testified at the hearing that he had difficulty walking more than a block or a block and a half because of pain, numbness and weakness in his right leg (Tr. at 45). He stated he could stand for twenty to thirty minutes (Tr. at 46). He further stated that he spent from six to seven hours a day laying down to relieve his back pain, only getting up to go to the bathroom or to wash dishes (Tr. at 46, 47).

Finally, Plaintiff testified that he was unable to participate in any outdoor activities, including hunting and fishing, as a result of his back pain (Tr. at 49). However, review of the records show his participation was not so limited. Plaintiff told Dr. Vale that he had gone fishing since the accident and was only able to hunt one day that year (Tr. at 126, 152). Moreover, Plaintiff mentioned in his deposition that he had been hunting several times since his injury and had gone fishing (Tr. at 152). On September 24, 2003, Plaintiff told Dr. Harlan that he was unable to bike, hunt or fish for any extended period of time (Tr. at 189). As a result, this factor supports the ALJ's credibility determination.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

At the hearing, Plaintiff testified that his pain was constant and varied in intensity between a four and a four and a half to a ten on a pain scale of zero to ten (Tr. at 44-45). He stated he experienced pain at a level ten several times a week (Tr. at 45). However, Plaintiff's medical records demonstrate that his pain was not constant and, in fact, that there were periods of time during which he did not feel pain.

On November 25, 1998, just two weeks after his accident, Plaintiff reported he was feeling

"better," and had forgotten a previous appointment (Tr. at 151). On December 7, 1997, he again complained of severe pain (Tr. at 123). He underwent physical therapy from December 18, 1998 through March 8, 1999, and felt it had been beneficial in reducing his hip pain (Tr. at 117). On January 11, 1999, Plaintiff indicated to Dr. Park that he had improved (Tr. at 123, 151). Plaintiff felt a moderate improvement in pain from an epidural steroid injection on April 6, 1999 (Tr. at 131, 151). As of July 12, 1999, Plaintiff felt his symptoms were basically "staying the same" (Tr. at 126).

On April 19, 2000, Plaintiff reported that his symptoms had increased in intensity (Tr. at 117, 152). He stated his symptoms worsened with activity and reported feeling the same or worse than the first week or two after his injury (Tr. at 151). On December 9, 2003, Plaintiff admitted pain was improving (Tr. at 174). Again on January 14, 2004, Plaintiff reported that his back pain had slowly improved (Tr. at 173). Only on March 3, 2004, the same day as he filed his Disability Report with the Field Office, did Plaintiff want to discuss back surgery again (Tr. at 170).

Additionally, Plaintiff did not initially experience pain on the right side of his body (Tr. at 126). He did not start complaining of right leg pain until several months after being released by Dr. Woodward in mid-April of 1999 (Tr. at 151). This factor also supports the ALJ's credibility analysis.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

At the hearing, Plaintiff testified that standing, walking and sitting all aggravated his pain (Tr. at 45). His medical records also show that Plaintiff reported his low back pain was exacerbated by bending, stooping, lifting, and any type of strenuous activity (Tr. at 133). Therefore, this factor does not support the ALJ's determination.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Although Plaintiff reported to several providers that his medication was beneficial in reducing his pain, he only took his prescribed medications on a sporadic basis. On November 19, 1998, Plaintiff was placed on Naprosyn and Ultram (Tr. at 123). By July 12, 1999, however, he was not taking any medications (Tr. at 127). Plaintiff's records show that he was not taking any prescription medications on April 19, 2000, so was given a prescription for Flexeril and Ultram (Tr. at 118-119).

On August 14, 2001, Plaintiff told Dr. Olive that treatment had not been beneficial in reducing his pain (Tr. at 133). He reported being out of his medications, although he had previously taken Ultram, Flexeril and an anti-inflammatory medicine that seemed to help (Tr. at 134). On February 19, 2002, Plaintiff reported sporadically taking Naproxen sodium, Ultram, and Cyclobenzaprine (Tr. at 143).

Plaintiff told Dr. Runde on April 15, 2003, that his pain lessened if he took his medications and remained off his feet (Tr. at 158). His current medications included Ultram, Cyclobenzaprine, and Naproxen (Tr. at 158). On September 24, 2003, Plaintiff was taking Naproxen, Cyclobenzaprine and Ultram for back pain and had been taking Effexor for depression for a couple of years (Tr. at 188). He told Dr. Harlan and Ms. Pepper that Effexor helped alleviate his symptoms of depression (Tr. at 189).

In addition, Plaintiff testified at the hearing that his medications caused him to have difficulty concentrating and he was unable to focus on and follow one-hour programs on television (Tr. at 48). He testified that he did not read because, "due to the medications[s], I can't focus or I loose my place, I can't really even remember what I've read, if I've read it" (Tr. at 51). However, Dr. Harlan

44

and Ms. Pepper noted that although Plaintiff commended his pain medication affected how fast he could process information and respond, he seemed to do well on most test items (Tr. at 190).

The record does not contain evidence that Plaintiff was forced to take the medications prescribed to him on a sporadic basis due to financial constraints. Even if this were the case, the only time Plaintiff ever indicated that he sought relief through any over-the-counter drugs was in his Disability Report; he never relayed this information to any of the physicians who treated or examined him. Therefore, this factor supports the ALJ's credibility determination.

### 6. FUNCTIONAL RESTRICTIONS

Review of the record as a whole shows that while Plaintiff's activities were restricted, he still could have performed at a greater exertional level than he claimed he was able. Plaintiff's February 12, 1999, physical therapy records reflect that he was supposed to return to work (Tr. at 131). On February 15, 1999, Dr. Woodward noted that Plaintiff was improving and felt he should be able to resume full activities in the near future (Tr. at 131). On April 6, 1999, Dr. Woodward continued Plaintiff on modified duty for one week, after which he was to resume regular duty (Tr. at 131). On April 16, 1999, Plaintiff was given a five percent permanent partial impairment of the total body and was released to full duty without restrictions (Tr. at 131).

Following a July 12, 1999, examination, Dr. Vale recommended the following work-place restrictions: Plaintiff should have the opportunity to sit, stand, or walk as needed to control back pain (Tr. at 130). He should avoid repetitive bending and twisting (Tr. at 130). He could lift up to twenty-five pounds occasionally, but no more than fifteen pounds frequently (Tr. at 130). Plaintiff should avoid climbing or working at unprotected heights (Tr. at 130). Finally, he should not drive any significant distances as a component of work and should avoid vibrational impact exposures to

45

the spine and pelvis (Tr. at 130).

After reviewing Plaintiff's September 12, 2000, MRI, Dr. Vale stated Plaintiff would be able to perform sedentary to light demand category work as long as he had the opportunity to sit, stand, and walk as needed for pain relief (Tr. at 109, 152).

On December 14, 2001, Dr. Ebelke saw no reason why Plaintiff could not ben employed in at least the medium work category (Tr. at 155-156). Dr. Ebelke stated that if Plaintiff elected not to undergo surgery, he would give him a seven percent disability rating on his body as a whole (Tr. at 156). He recommended activity as tolerated, but could not restrict Plaintiff past a medium work category that permitted occasional lifting of fifty pounds and repetitive lifting of twenty-five pounds (Tr. at 156).

Dr. Runde determined that Plaintiff should be able to stand and walk up to six hours in a workday with normal breaks (Tr. at 159). In addition, he should limit sitting to no more than one hour at a time for a total of four hours in an eight-hour workday with normal breaks (Tr. at 159). Based on these restrictions, Dr. Runde thought Plaintiff was capable of working a forty-hour workweek on a continuous basis (Tr. at 159).

Despite being released to work on numerous occasions by at least four different physicians, Plaintiff never returned to work or otherwise performed at the level he was thought capable. As a result, I find that this factor supports the ALJ's determination.

## B. CREDIBILITY CONCLUSION

In addition to the factors described above, I note that Plaintiff's medical records do not document the respective dates on which he first began using a cane and wearing a back brace, or upon whose recommendation these remedial measures were taken. Specifically regarding the cane,

46

Dr. Crabtree did not mention Plaintiff's use of a cane during his April 3, 2001, appointment. He was first noted to use a cane on August 14, 2001. Nevertheless, Dr. Ebelke indicated that Plaintiff's use of a cane was inconsistent with his complaints of pain (Tr. at 153).

Furthermore, three of the physicians who examined Plaintiff called his credibility into question. In his December 14, 2001, letter to Judge Siedlik, Dr. Ebelke stated there were "definite signs of symptom magnification" and described Plaintiff's right leg pain as "non-physiologic " (Tr. at 153). He could not reproduce the pain/weakness detected by Dr. Olive in Plaintiff's right ankle (Tr. at 154). On October 10, 2003, Dr. Pak found Plaintiff's presentation to be "extreme and out of proportion" and noted decreased effort during physical examination (Tr. at 185). In connection with performing a physical residual functional capacity assessment, Dr. Stoecker found that the "severity or duration of symptoms were disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s)" (Tr. at 166). He also noted that Plaintiff gave "poor effort and non-physiologic responses to multiple orthopedic and physiatric exams that severely impair[ed] his credibility" (Tr. at 166).

For all of the reasons discussed above, I find that the substantial evidence in the record supports the ALJ's finding that Plaintiff's allegations are not entirely credible. Plaintiff's motion for summary judgment on this basis is denied.

## VII. *MEDICAL-VOCATIONAL GUIDELINES*

When a claimant suffers from a combination of exertional[44] and nonexertional[45] impairments,

---

[44] An exertional limitation is an impairment-caused limitation that affects a claimant's ability to sit, stand, walk, lift, carry, push, or pull. Social Security Ruling 96-9p (1996).

[45] A nonexertional limitation is " an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling." Social Security Ruling 96-9p (1996).

but is not entitled to a finding of disability based solely on his or her exertional impairment, "the ALJ must then consider the extent to which the claimant's work capability is further diminished by his or her nonexertional impairment[ ]." Tucker v. Heckler, 776 F.2d 793, 795 (8th Cir. 1985). If an ALJ "determines that a claimant's nonexertional limitations do not affect the claimant's residual functional capacity then the ALJ may rely on the [Medical-Vocational] Guidelines" to determine whether the claimant is disabled without resorting to vocational expert testimony. Thompson v. Bowen, 850 F.2d 346, (8th Cir. 1988). Use of the Guidelines is appropriate when the ALJ "explicitly discredits subjective allegations of pain for a legally sufficient reason." Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987); Millbrook v. Heckler, 780 F.2d. 1371, 1373 (8th Cir. 1985).

Here, Plaintiff alleges that he suffers from both (1) nonexertional limitations, including depression, inability to concentrate, and chronic pain, and (2) exertional limitations, including sitting, standing and walking. As more fully explained in the two preceding sections, substantial evidence exists to support the ALJ's determination both that Plaintiff's depression was non-severe and that his complaints of pain were not credible. Based on these findings, Plaintiff does not suffer from a significant nonexertional impairment. The ALJ was, therefore, able to rely solely on the Medical-Vocational Guidelines in determining that Plaintiff was not disabled under the Act. Plaintiff's motion for summary judgment on this basis is denied.

## VIII. CONCLUSIONS

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 26, 2005

49